FILED

2007 Apr-09  PM 02:52
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| HR ACQUISITION I CORPORATION, formerly known as Capstone Capital Corporation, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | CASE NO.: 2:05-CV-2047-VEH |
| TWIN CITY FIRE INSURANCE COMPANY, | ) ) ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

### I.  INTRODUCTION

Plaintiff HR Acquisition I Corporation ("HR Acquisition") initiated a state court insurance coverage action (05-5503) on September 16, 2005.  (Doc. #1 at Ex. B).  Defendant Twin City Fire Insurance Company ("Twin City") removed this case to this court on September 28, 2005.  (Doc. #1).

In this lawsuit, HR Acquisition seeks a determination regarding the rights and duties owed by Twin City to Capstone Capital Corporation ("Capstone")[1] under an insurance policy entitled "Directors, Officers and Company Liability Policy for Members of the National Association of Real Estate Investment Trusts," Policy No.

---

[1] Capstone was renamed HR Acquisition on October 15, 1998.  (Doc. #1 at Ex. B ¶ 2).

NAR 0143871-00 (the "Policy").  (Doc. #1 at Ex. B at Count I).  HR Acquisition has also sued Twin City for breach of contract under the Policy.  (*Id.* at Count II).

The issue of coverage under the Policy stems from an underlying piece of consolidated litigation relating to HealthSouth Corporation ("HealthSouth").  More specifically, the dispute relates to the denial of insurance coverage under the Policy for a lawsuit captioned *Wade Tucker, derivatively for the benefit of and on behalf of the nominal defendant HealthSouth Corporation v. Scrushy, et al.*, CV 02-5212 (AEH) (the "*Tucker* Derivative Action").  (Doc. #1 at Ex. B ¶ 1).

Pending before the court is Twin City's Motion for Summary Judgment (Doc. #23) filed on January 26, 2006.  As discussed more fully below, Twin City's Motion for Summary Judgment is due to be denied because material factual disputes preclude the entry of judgment as a matter of law in its favor.

## II.    STANDARD ON SUMMARY JUDGMENT

Courts should grant summary judgment when "there is no genuine issue of material fact . . . and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The moving party always bears the initial responsibility of informing the district court about the grounds of its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any' which it believes demonstrates the absence of a

genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). In deciding whether the movant has met this burden, the court must examine the facts in the light most favorable to the non-moving party. *Allen v. Tyson Foods, Inc.*, 121 F.3d 642 (11th Cir. 1997) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). Once the moving party has met this burden, the non-movant must then present evidence establishing that there is a genuine issue of material fact that precludes the entry of judgment as a matter of law in favor of the movant. *Celotex*, 477 U.S. at 325.

Additionally, "[i]f the movant bears the burden of proof on an issue, because, as a defendant, it is asserting an affirmative defense [such as, an exclusion under an insurance policy], it must establish that there is no genuine issue of material fact as to any element of that defense." *International Stamp Art, Inc. v. U.S. Postal Service*, 456 F.3d 1270, 1273 -74 (11th Cir. 2006) (citation omitted).

## III.   STATEMENT OF FACTS[2]

### A.   The *Tucker* Derivative Action and the Parties

On or about August 28, 2002, the *Tucker* Derivative Action was filed against

numerous present and former directors and officers of HealthSouth and a number of

additional entities.   AF No. 1.1.[3]   The operative pleading in the *Tucker* Derivative

Action is reflected by the Third Amended Verified Complaint, as modified by the

---

[2]If the facts are in dispute, they are stated in the manner most favorable to the non-moving party.  *See Fitzpatrick v. City of Atlanta*, 2 F.3d at 1115.  Additionally, these are the facts for summary judgment purposes only.  They may not be the actual facts.  *See Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994) ("'[W]hat we state as 'facts' in this opinion for purposes of reviewing the rulings on the summary judgment motion [ ] may not be the actual facts.'") (citation omitted).

[3]The designation "AF" stands for admitted fact and indicates a fact offered by the Twin City that HR Acquisition has admitted in its written submissions on summary judgment or by virtue of any other evidence offered in support of its case. Whenever HR Acquisition has adequately disputed a fact offered by Twin City, the court has accepted HR Acquisition's version. The court's numbering of admitted facts (*e.g.*, AF No. 1) corresponds to the numbering of Twin City's Statement of Facts as set forth in Doc. #25 and responded to by HR Acquisition in Doc. #26.  A number (or a number and a letter) following a decimal point corresponds to the particular sentence within the numbered statement of facts.  For example, (AF No. 1.2) would indicate that the second sentence of paragraph 1 of Twin City's Statement of Facts is the subject of the court's citation to the record.  Similarly,(AF No. 17.2(a)) would indicate that subsection "a" of the second sentence of paragraph 17 of Twin City's Statement of Facts is the subject of the court's citation to the record. Also, the designation "AAF" stands for additional admitted fact and corresponds to HR Acquisition's Statement of Additional Facts contained in Doc. #26 and responded to by Twin City in Doc. #31.  Any other facts referenced by the parties that require further clarification are dealt with later in the court's opinion.

Supplemental Complaint and Fourth Amended Complaint.  AF No. 1.2; Doc. #28 at Ex. 1.  The *Tucker* Derivative Action generally alleges that HealthSouth engaged in a massive accounting fraud scheme and that its directors and officers breached their fiduciary duties to HealthSouth and its shareholders by entering into numerous self-interested transactions from which they received improper benefits and that constituted misappropriations of corporate opportunities and a waste of corporate assets.  AF No. 2.

In addition to HealthSouth's directors and officers, the *Tucker* Derivative Action names as defendants a number of outside entities, which allegedly aided and abetted these breaches of fiduciary duty and/or conspired with HealthSouth's directors and officers to injure HealthSouth.  AF No. 3.1.  Among these entities are a number of companies that were allegedly owned or controlled by certain HealthSouth directors and officers, including Capstone.  AF No. 3.2.

Relevant for present purposes, Richard Scrushy ("Scrushy") is alleged to have been the former Chairman of the Board and CEO of HealthSouth and to have served as a director and/or consultant of Capstone.  AF No. 4.1.  More specifically, the *Tucker* Derivative Action alleges that Scrushy was "at all times relevant to the claims asserted herein a director and/or consultant of defendant Capstone Capital Corporation ('Capstone') and/or its successor corporation."  AAF No. 41.1.  It also

alleges that Scrushy "formed or allowed the formation of Capstone" and served on its Board of Directors.  AAF No. 41.2.

Michael Martin ("Martin") is alleged to have served as an officer of HealthSouth and as a director and/or consultant to Capstone.  AF No. 4.2.  More specifically, the *Tucker* Derivative Action alleges that Martin was "at all times relevant to the claims asserted herein a director and/or consultant to Capstone and/or its successor corporation."  AAF 42.1.  It also alleges that Martin "formed or allowed the formation of Capstone" and served on its Board of Directors.  AAF 42.2.  Finally, Larry Striplin ("Striplin") is alleged to have served as a member of HealthSouth's Board of Directors and as a director of Capstone.  AF No. 4.3.  The *Tucker* Derivative Action incorporates by reference the introductory allegations stating that Scrushy, Martin and Striplin served as directors or officers of Capstone.  AAF No. 44.

Capstone is alleged to have been a party to certain of the alleged self-dealing transactions.  AF No. 7.  In particular, it is alleged that HealthSouth, at the direction of Scrushy and others, sold depreciable buildings to Capstone and then entered into long-term lease agreements to lease the buildings back to HealthSouth at inflated rental amounts.  AF No. 8.1.  These transactions were allegedly entered into to provide money to Scrushy, Martin and other defendants.  AF No. 8.2.  HealthSouth allegedly overpaid millions of dollars pursuant to this scheme, which is further

alleged to have constituted a breach of the duty of loyalty owed to HealthSouth. AF No. 8.3. The *Tucker* Derivative Action does not identify specific transactions between HealthSouth and Capstone. AAF No. 47.

In addition, it is alleged that when Capstone was acquired or merged with Healthcare Realty Trust ("HRT"), Scrushy and Martin were paid millions of dollars as stockholders pursuant to buyout consulting agreements. AF No. 9.1. It is further alleged that Scrushy and Martin became paid consultants to HRT, with the knowledge of Striplin, and that they received stock worth millions of dollars pursuant to this agreement in violation of the fiduciary duties they owed to HealthSouth. AF No. 9.2. The *Tucker* Derivative Action seeks damages against Scrushy, Martin, and Striplin, individually, but contains allegations pertaining to their activities in their capacities as directors and officers of Capstone. AF No. 10.

The *Tucker* Derivative Action expressly references an earlier lawsuit involving the dealings between HealthSouth and Capstone, *United States of America ex rel. Greg Madrid v. HealthSouth Corp., et al.*, CV-97-C-3206 (N.D. Ala., 1997) (the "*Madrid* Action"). AF No. 11. The *Madrid* Action was filed on December 15, 1997, and the named defendants included HealthSouth, Scrushy and Capstone. AF No. 12. In pertinent part, the *Madrid* Action, like the *Tucker* Derivative Action, alleged that Scrushy was a co-founder and director of Capstone and that he owned a substantial

7

interest in Capstone.  AF No. 13.  Capstone and Scrushy were never served and never appeared in the *qui tam Madrid* Action.  AAF No. 48.

The *Madrid* Action further alleged, like the *Tucker* Derivative Action, that HealthSouth, at the direction of Scrushy, engaged in a series of transactions with Capstone under which HealthSouth sold depreciable buildings to Capstone and then entered into long-term lease agreements under which HealthSouth leased these buildings back from Capstone at inflated prices.  AF No. 14.  The complaint in the *Madrid* Action did not identify specific transactions involving Capstone and HealthSouth.  AAF No. 49.

The *Tucker* Derivative Action alleges concerning the *Madrid* Action that "[o]n May 18, 2001, HealthSouth entered into a Joint Stipulation of Dismissal with the United States and Greg Madrid pursuant to which HealthSouth agreed to pay $7.9 million to the government and abide by a Corporate Integrity Agreement; and the United States agreed to dismiss all claims in the *qui tam* complaint, including those against the individuals Scrushy and Gerald."  (Doc. #28 at Ex. 1 ¶ 60).  The *Tucker* Derivative Action further alleges that in causing HealthSouth to pay $7.9 million to settle the *Madrid* Action, Scrushy breached fiduciary duties owed to HealthSouth, was unjustly enriched, and wasted corporate assets, because HealthSouth itself had been damaged by the overpayment scheme from which Scrushy benefitted personally.

8

AF No. 16.  The *Madrid* Action was dismissed with prejudice by an Order of

Dismissal and Lifting of Seal entered on May 21, 2001.  AAF No. 50.

Martin has pled guilty to committing deliberately fraudulent acts in connection

with his role in the HealthSouth accounting fraud scheme.  AF No. 17.1.  The factual

basis for his guilty plea states in part that:

> (a)     Martin became aware that the company was not meeting earnings
> projections as early as 1994.   After becoming CFO, he reviewed
> accurate financial results, which showed that HealthSouth was not
> meeting earnings projections.  Martin and another senior officer were
> then instructed by Scrushy to fix the books and records of HealthSouth
> so that they would reflect projected earnings.  AF No. 17.2(a).
>
> (b)     Martin attended meetings with the accounting staff where they
> discussed how the financial statements could be changed to meet
> earnings projections.  AF No. 17.2(b); and
>
> (c)     As HealthSouth's CFO, Martin signed SEC filings knowing that
> the financial statements attached to the filings did not fairly present the
> financial condition and operating results of HealthSouth.   AF No.
> 17.2(c).

The Rule 11(f) Factual Basis for Guilty Plea pertaining to Martin's guilty plea in

*United States of America v. Michael Martin*, CR-03-C-0191-S (N.D. Ala.), did not

refer to any transactions between HealthSouth and Capstone as a basis for the charges

against Martin or his guilty plea.  AAF No. 52.  The charges to which Martin pleaded

guilty do not form a basis for a purported cause of action against Capstone in the

*Tucker* Derivative Action.  AAF No. 53.

The *Tucker* Derivative Action includes many of the same allegations of accounting fraud that are contained in Martin's guilty plea:

(a)    HealthSouth's directors and officers conspired to misrepresent and falsely inflate earnings and HealthSouth's true financial condition. AF No. 18(a);

(b)    The overstatement of earnings occurred because Scrushy insisted that HealthSouth meet or exceed earnings expectations.   When HealthSouth fell short of estimates, Scrushy directed HealthSouth's accounting personnel to "fix" it by artificially inflating earnings.  AF No 18(b);

(c)    In furtherance of the conspiracy, Scrushy and others met with HealthSouth's accounting staff in order to discuss how the accounting staff would falsify HealthSouth's books to meet earnings.  AF No. 18(c); and

(d)    As part of the conspiracy, defendants filed materials with the SEC that overstated HealthSouth's operating results.  AF No. 18(d).

**B.    The Corporate Identity of Capstone, Twin City's Denial of HR Acquisition's Request for Coverage under the Policy, and the Costs of Defense in the *Tucker* Derivative Action**

Pursuant to a merger agreement entered into on June 8, 1998, Capstone was merged into plaintiff HR Acquisition.  AF No. 19.1.  Pursuant to this agreement, Capstone was the surviving corporate entity under the name HR Acquisition.  AF No. 19.2.  HR Acquisition, in turn, is a wholly owned subsidiary of HRT.  AF No. 19.3.

After HR Acquisition submitted the *Tucker* Derivative Action to Twin City for coverage under the Policy issued to Capstone, Twin City denied coverage by certified

letter dated March 15, 2004. (Doc. #24 at Ex. E). HR Acquisition then filed this lawsuit against Twin City seeking coverage for Capstone in connection with the *Tucker* Derivative Action. AF No. 21.

The invoices reflecting fees and costs incurred in connection with the defense of HR Acquisition f/n/a Capstone in the *Tucker* Derivative Action have been billed to HRT. AF No. 22. Historically, all fees and costs incurred in connection with the defense of HR Acquisition f/n/a Capstone in the *Tucker* Derivative Action have been paid by either HRT or an entity named ASMI/Birmingham Medical Building SPE, LLC ("ASMI/Birmingham"). AF No. 23. Capstone does not have other insurance for the *Tucker* Derivative Action, nor does it have indemnity agreements pertaining to the litigation with any other party. AAF No. 55.

HRT itself is a named defendant in the *Tucker* Derivative Action. AF No. 24. HRT was dismissed as a defendant in the *Tucker* Derivative Action on September 21, 2004. AAF No. 56. HR Acquisition does not in this action seek a declaration of coverage or any other relief on behalf of Scrushy, Martin, or Striplin as directors or officers of Capstone. AF No. 25. Neither Scrushy, Martin, nor Striplin have submitted the *Tucker* Derivative Action for coverage under the Policy issued by Twin City to Capstone. AF No. 26. Apparently, neither Scrushy, Martin, nor Striplin have sought indemnification in connection with the *Tucker* Derivative Action, even though

they may have been entitled to such indemnification under the Merger Agreement. AF No. 27.

### C.      The Twin City Policy

The Twin City Policy was in effect for the policy period from July 15, 2000, to October 15, 2004, with an aggregate limit of liability of $10,000,000.  AF No. 28. Subject to its terms, conditions, and exclusions, the Policy provides what is known as "claims made" coverage, which means that the policy covers only those claims first made during the policy period.  AF No. 29.1.  The Policy contains a number of specific terms, conditions, and exclusions that are relevant to a determination of coverage.  AF No. 29.2.

The Policy contains four "Insuring Agreements," only one of which is relevant here.  AF No. 30.1.  Insuring Agreement (D) states that Twin City "will pay on behalf of the **Company Loss** . . . which the **Company** shall become legally obligated to pay as a result of a **Non-Securities Claim** first made during the **Policy Period** . . . against the **Company** for a **Wrongful Act** which takes place during or prior to the **Policy Period**."  AF No. 30.2.

The Policy defines a "**Non-Securities Claim**" as:

> any **Claim** other than a **Securities Claim** jointly first made against both the **Company** and the **Directors** and **Officers**.  If such claim is dismissed or otherwise discontinued against the **Directors** and **Officers**

12

and is continuously maintained against the **Company**, such **Claim** shall continue to be deemed a **Non-Securities Claim**.

AF No. 31.

The Policy defines a "**Claim**" in pertinent part as:

a civil or criminal proceeding commenced by the service of a complaint or similar pleading . . . against **Directors** or **Officers**, or with respect to Insuring Agreements B(2), C and D, the **Company**, for a **Wrongful Act**, including any appeal therefrom.

AF No. 32; AAF No. 57.

The Policy defines "**Wrongful Act**" in pertinent part as:

any actual or alleged error, misstatement, misleading statement, act, omission, neglect or breach of duty, committed or attempted by the **Directors** and **Officers**, in their capacity as such, . . . or, with respect to Insuring Agreements B(2), C and D, by the **Company** . . .

AF No. 33.  The *Tucker* Derivative Action alleges a "**Wrongful Act**" by Capstone

within the meaning of the Policy.  AAF No. 64.

The Policy defines "**Loss**" in pertinent part as:

sums which the **Directors** and **Officers**, or, with respect to Insuring Agreements B(2), C and D, the **Company**, are legally liable to pay solely as a result of any **Claim** insured by this Policy, including **Claims Expenses**, compensatory damages, settlement amounts and legal fees and costs awarded pursuant to judgments, but excluding fines, penalties, taxes, any amount allocated to uncovered loss pursuant to Section VII of this Policy, or matters uninsurable pursuant to any applicable law…

AF No. 34.

The term "**Insured**" means "one or more Directors or Officers and, solely with respect to Insuring Agreements B, C and D, the Company."  AF No. 35.  The term "**Directors** and **Officers**" includes past, present, and future "directors, officers, trustees, trust managers, managers, members, general partners, partnership managers or joint venture managers of" Capstone.  AF No. 36.  The Policy's definition of "**Directors** and **Officers**" is not limited to individuals acting in their officials capacities with Capstone, but instead includes "one or more natural persons who were, now are or shall hereafter be duly elected, appointed or selected directors, officers, trustees, trust managers, managers, members, general partners, partnership managers or joint venture managers of a **Company**," and "with respect to **Securities Claims** and **Non-Securities Claims** only, any other natural persons who were, now are or shall hereafter be employees of the **Company**."  AAF No. 66.

The Policy requires Twin City to "advance on behalf of the **Insureds Claims Expenses** which the **Directors** and **Officers** or, solely with respect to Insuring Agreements B(2), C and D, the **Company**, have incurred in connection with **Claims** made against them, prior to disposition of such **Claims**," subject to a repayment provision for non-covered **Claims Expenses**.  (Doc. #24 at Ex. K at 5 § III.(C)). "**Claims Expenses**"are defined under the Policy as "that portion of **Loss** consisting of reasonable and necessary fees (including attorneys' fees and experts' fees) and

14

expenses incurred in the defense or appeal of a **Claim**, but shall not include the wages, salaries, benefits or expenses of any **Directors**, **Officers** or employees of the **Company**.  (Doc. #24 at Ex. K at 5 § IV.(B)).

The Policy includes a number of exclusions which Twin City contend are applicable to this matter.  AF No. 37.1.  The first is the "outside service" exclusion, which states in pertinent part that:

> The **Insurer** shall not be liable to make any payments for **Loss** in connection with any **Claim** made against the **Directors** and **Officers**, or with respect to Insuring Agreements B(2), C and D, the **Company**:
>
> based upon, arising from or in any way related to such **Directors** and **Officers** serving as a director, officer, trustee, regent, governor, trust manager, manager, general partner, partnership manager, joint venture manager or employee of any entity other than the **Company** even if such service is at the direction or request of the **Company** . . .

AF No. 37.2.

The Policy also includes a "prior litigation" exclusion, which states that:

> The **Insurer** shall not be liable to make any payments for **Loss** in connection with any **Claim** made against the **Directors** and **Officers**, or with respect to Insuring Agreements B(2), C and D, the Company:
>
> based upon arising from, or in any way related to any demand, suit, or other proceeding against any **Insured** which was pending on or existed prior to the applicable **Prior Litigation Date** specified by endorsement to this Policy, or the same or substantially the same facts, circumstances or allegations which are the subject of or the basis for such demand, suit or other proceeding.

AF No. 38.  The "**Prior Litigation Date**" applicable to this exclusion is December

17, 1997.  AF No. 39.

Finally, the Policy contains a "fraud" exclusion, which states in pertinent part

that:

> The **Insurer** shall not be liable to make any payments for **Loss** in
> connection with any **Claim** made against the **Directors** and **Officers**, or
> with respect to Insuring Agreements B(2), C and D, the **Company**:
>
> based upon, arising from, or in any way related to their committing any
> deliberately fraudulent act if a judgment or other adjudication adverse
> to such Insured establishes such an act, provided this exclusion shall
> apply to Insuring Agreements C and D, if granted, only if such judgment
> or final adjudication establishes that a **Director** or **Executive Officer** of
> the **Company** committed such an act . . .

AF No. 40; AAF No. 58.

## IV.⎵⎵ANALYSIS

### A.    Duty to Advance Defense Costs/Duty to Defend[4]

#### 1.    Justiciability Requirements

Whether an insurer has a duty to defend is generally considered a ripe case for

---

[4]In its opposition, HR Acquisition states that the duty to advance defense costs
is analyzed similarly to an insurer's duty to defend.  (Doc. #26 at 13-14).  In its reply,
Twin City does not dispute this statement of law.  The court uses the term duty to
defend for analysis purposes as have the parties, recognizing that the Policy, if
triggered, obligates Twin City to advance expenses, rather than to provide a defense,
which would customarily also require that defense counsel be retained for the benefit
of the insured. (Doc. #24 at Ex. K at 5 § III.(C)).

declaratory relief. *Ex parte Alfa Mut. Ins. Co.*, 921 So. 2d 418, 419-20 (Ala. 2005) (citing *Smith v. North River Insurance Co.*, 360 So. 2d 313 (Ala. 1978)).  This case presents no exception.

**2.**   **Alabama Law Governing Insurance Contract Disputes Generally**[5]

**a.**   **Duty to Defend**

Under Alabama law, the duty to defend is greater than the duty to indemnify. *See Ladner & Co. v. Southern Guaranty Ins. Co.*, 347 So. 2d 100, 102 (Ala. 1977) ("If the allegations of the injured parties' complaint show an accident or occurrence which comes within the coverage of the policy, the insurer is obligated to defend regardless of the ultimate liability of the insured."); *see also Chandler v. Alabama Mun. Ins. Co.*, 585 So. 2d 1365, 1367 (Ala. 1991) (same) (internal citations omitted). Additionally, "[w]hen a complaint alleges both acts covered under the policy and acts not covered, the insurer is under a duty to at least defend the allegations covered by the policy." *Acceptance Ins. Co. v. Brown*, 832 So.2d 1, 14 (Ala. 2001) (citations omitted).

---

[5]The "Declarations" page of the Policy lists Capstone as the "Named Real Estate Investment Trust" with an Alabama address of 1000 Urban Center Drive, Birmingham 35242. Several of the Policy's endorsements also reference "Alabama." (Doc. #24 at Ex. K at 20 ("Multi-Year Endorsement - Alabama"); *id.* at 24 ("Cancellation Endorsement Alabama")).  Accordingly, Alabama is the state in which the Policy was delivered.

An insurance company's duty to defend its insured from suit is determined by the language of the insurance policy and by the allegations in the complaint filed against the insured.[6] *Alfa Mutual Ins. Co. v. Morrison*, 613 So. 2d 381, 382 (Ala. 1993); *Ladner*, 347 So. 2d at 102 (Ala. 1977); *see also Perkins v. Hartford Ins. Group*, 932 F.2d 1392 (11th Cir. 1991) ("Generally, the obligation of the insurer to defend its insured is determined by the allegations of the third-party complaint.") (citing *Ladner*, 347 So.2d at 102). Generally, an insurer owes no duty to defend, if the complaint fails to aver a covered accident or occurrence (or as in this case, a wrongful act). *Ladner*, 347 So. 2d at 102; *see also Hartford Cas. Ins. Co. v. Merchants & Farmers Bank*, 928 So.2d 1006, 1010 (Ala. 2005) ("The insurer owes no duty to defend only if neither does the complaint against the insured allege a covered accident or occurrence nor does the evidence in the litigation between [the injured person] and the insured prove a covered accident or occurrence [or a wrongful act].").

However, "[w]here the allegations of the complaint show that no injury alleged

---

[6]"'Under the *Erie* doctrine, a federal court adjudicating state law claims applies the substantive law of the state.'" *Sphinx Intern., Inc. v. National Union Fire Ins. Co. of Pittsburgh, Pa.*, 412 F.3d 1224, 1227 (11th Cir. 2005) (quoting *Ungaro-Benages v. Dresdner Bank AG*, 379 F.3d 1227, 1232 (11th Cir. 2004) (citations omitted)). Moreover, the substantive law of the state governs the interpretation of insurance contracts. *Provau v. State Farm Mut. Ins. Co.*, 772 F.2d 817, 819 (11th Cir. 1985). Hence, the insurance contract issues in this case are governed by Alabama law.

is within the coverage of the policy, . . . or where the allegations are ambiguous, 'the court is not limited to the bare allegations of the complaint . . . but may also look to facts which may be proved by admissible evidence.'" *Guar. Nat'l Ins. Co. v. Beeline Stores, Inc.*, 945 F. Supp. 1510, 1513 (M.D. Ala. 1996) (quoting *Chandler v. Alabama Mun. Ins. Co.*, 585 So. 2d 1365 (Ala. 1991)).  Similarly, "[i]f the complaint against the insured does not, on its face, allege a covered accident or occurrence, but the evidence proves so, then the insurer likely owes the duty to defend."  *Tanner v. State Farm Fire & Cas. Co.*, 874 So. 2d 1058, 1065 (Ala. 2003).

### b.    Contractual Ambiguities

Regarding contractual ambiguities, the Supreme Court of Alabama has summarized:

> "'The test to be applied by [a] court in determining whether there is ambiguity is not what the insurer intended its words to mean, but what a reasonably prudent person applying for insurance would have understood them to mean.' Lee R. Russ & Thomas F. Segalla, Couch on Insurance § 21:14, pp. 21-23 (3d ed. 1997); *see, also, Western World Ins. Co. v. City of Tuscumbia*, 612 So. 2d 1159, 1161 (Ala.1992) (same); *St. Paul Fire & Marine Ins. Co. v. Edge Memorial Hosp.*, 584 So.2d 1316, 1322 (Ala.1991) (stating that language in an insurance policy should be given the same meaning that an ordinary person, not a lawyer, would reasonably ascribe to the language).  The terms of an insurance policy are ambiguous only if the policy's provisions are reasonably susceptible to two or more constructions or there is reasonable doubt or confusion as to their meaning. *See United Services Auto. Ass'n v. Smith*, 57 Ala. App. 506, 329 So. 2d 562 (Ala. Civ. App. 1976).  In determining whether an ambiguity exists, a court should apply the common

interpretation of the language alleged to be ambiguous.  *See Alabama Farm Bureau Mut. Cas. Ins. Co. v. Goodman*, 279 Ala. 538, 541, 188 So. 2d 268, 270 (1966).  This means that the terms of an insurance policy should be given a rational and practical construction.  *Green v. Merrill*, 293 Ala. 628, 308 So. 2d 702 (1975). Also, a court cannot consider the language in the policy in isolation, but must consider the policy as a whole.  *Turner v. United States Fidelity & Guar. Co.*, 440 So.2d 1026 (Ala.1983)."

*See Porterfield v. Audubon Indem. Co.*, 856 So. 2d 789, 799 (Ala. 2002).  However, "[i]f there is no ambiguity, courts must enforce insurance contracts as written and cannot defeat express provisions in a policy, including exclusions from coverage, by making a new contract for the parties."  *Porterfield*, 856 So. 2d at 800 (citation omitted).

### c.    Burdens of Proof

Regarding the parties' respective burdens of proof, the insured bears the initial burden of proving that a particular claim or occurrence falls within coverage under the insurance policy.  *See, e.g., Colonial Life & Acc. Ins. Co. v. Collins*, 194 So.2d 532, 535 (Ala. 1967) ("The burden was on plaintiff to prove that the insured's death resulted from injuries sustained in such manner as to bring him within the coverage of the policy.").

On the other hand, "the insurer bears the burden of proving the applicability of any policy exclusion."  *Universal Underwriters Ins. Co. v. Stokes Chevrolet, Inc.*,

990 F.2d 598, 604 (11th Cir. 1993) (citing *Fleming v. Alabama Farm Bureau Mut. Cas. Ins. Co.*, 310 So.2d 200, 202 (Ala.1975)) (other citation omitted).  Additionally, Alabama law calls for a narrow view of exclusions to provide the maximum coverage that a reasonable reading will allow.  *Porterfield*, 856 So. 2d at 799-800.  "[W]hen doubt exists as to whether coverage is provided under an insurance policy, the language used by the insurer must be construed for the benefit of the insured."  *Id.*, 856 So. 2d at 800 (citation omitted).

### 3.   Twin City bases its lack of any duty to defend under the Policy upon several different reasons.

In support of its Motion for Summary Judgment, Twin City maintains that it is entitled to judgment as a matter of law because  no coverage exists under the Policy for the claims asserted against Capstone in the *Tucker* Derivative Action.  More specifically, Twin City contends that it is entitled to summary judgment because no wrongful acts within the meaning of the Policy have been alleged in the *Tucker* Derivative Action.  Alternatively, Twin City also argues for the application of several different exclusions under the Policy as a matter of law.  Finally, Twin City argues that because Capstone has incurred no loss as a result of the *Tucker* Derivative Action, no coverage under the Policy exists.

### a. The *Tucker* Derivative Action is within the scope of the Policy's general coverage for "Wrongful Acts."

The court disagrees with Twin City's characterization of the *Tucker* Derivative Action as not triggering coverage for any "Wrongful Acts" under the Policy. At its root, Twin City tries to draw a distinction between allegations made about Scrushy, Martin, and Striplin <u>serving</u> as Capstone directors and officers (which are expressly within the *Tucker* Derivative Action) as opposed to allegations made about them <u>acting</u> in a Capstone capacity. This is a distinction without a legal difference.

Instead, the material consideration is whether Scrushy, Martin, and Striplin's capacities as Capstone directors and officers are implicated in the *Tucker* Derivative Action, which they expressly are.[7]  Similarly, the *Tucker* Derivative Action does not limit recovery to Scrushy, Martin, and Striplin's activities as directors and officers of

---

[7]Had the *Tucker* Derivative Action made no mention of Scrushy, Martin, and Striplin's capacities as Capstone directors and officers, then Twin City's argument would have potential merit. *See Bowie v. Home Ins. Co.*, 923 F.2d 705, 708 (9th Cir. 1991) ("The California action names them as defendants only in their capacities as Transit officials. The mere fact that Bowie and Gregory are named in the California action is not controlling. The directors of Transit and the directors of DMT may as well have been completely different people. What is important is not their identities but their capacities. Here the insured capacities are not implicated in the California action. Because there is no lawsuit against an insured party, there is no one to whom a duty to defend is owed."). Unlike the *Bowie* case, the Capstone capacities held by Scrushy, Martin, and Striplin are expressly part of the *Tucker* Derivative Action.

HealthSouth.  Nor does it name Scrushy, Martin, and Striplin without any reference to their roles with Capstone.  To the contrary, the *Tucker* Derivative Action expressly references their alleged collective connection to the very creation and/or running of Capstone.

Moreover, Twin City has not cited to and this court has not been able to independently locate any controlling case authority in which the word choice between using "serving" over "acting" as to officers and directors made a difference in finding coverage for a Wrongful Act.  At best Twin City has only created a close call as to this general coverage issue.  In those types of situations, Alabama law supports resolving any coverage dispute in favor of the insured.  *See Colonial Life*, 194 So. 2d at 535 ("It is a well-established principle that insurance contracts will be construed most strongly against the insurer.").

Accordingly, the court finds that Twin City's interpretation of the Policy language of the "Wrongful Act"  in the context of the *Tucker* Derivative Action's allegations relating to the officers and directors of Capstone is not reasonable.  Alternatively, the court finds the Policy to be ambiguous, subject to more than one reasonable interpretation, and regardless that material factual disputes preclude the entry of summary judgment.  As a result, Twin City's Motion for Summary Judgment is due to be denied on this particular basis.

b.      The "Outside Service" Exclusion

Twin City maintains that the "outside service" exclusion excludes the *Tucker* Derivative Action from coverage under the Policy because of its allegations made against Scrushy, Martin, and Striplin in their roles as officers and directors of HealthSouth.  The court finds that the language of the "outside service" exclusion does not reasonably support Twin City's interpretation of it or, alternatively, it is ambiguous as to its application to the *Tucker* Derivative Action.  Additionally, the court finds that material factual disputes preclude the entry of summary judgment as to the exclusion.  Accordingly, Twin City has not carried its burden of showing the application of the "outside service" exclusion as a matter of law.

More specifically, the use of the phrase "of any entity other than the Company even if such service is at the direction or request of the Company" leaves open the question of whether the exclusion is appropriately applicable when a lawsuit arises out of roles held by officers and directors both within the Company (*i.e.*, Capstone) and without (*i.e.*, HealthSouth).  In other words, the exclusion does not speak to the very type of situation that is present in the *Tucker* Derivative Action in which the capacities connected to the "inside" Capstone and the capacities related to the "outside" HealthSouth have allegedly merged together to cause harm.  Instead, the exclusion only directly speaks to a case arising out of a person's role as an officer and

24

director of another company, who just happens to also be a director or an office of Capstone.

Nor has Twin City pointed to any controlling case law that supports its expansive reading of the "outside service" exclusion and, as the insurer, Twin City carries the burden to show the proper application of the exclusion as a matter of law. Under such circumstances, Twin City has not met its burden on summary judgment with respect to the "outside service" exclusion.

### c.    The "Prior Litigation" Exclusion

Twin City has also failed to show the application of the "prior litigation" exclusion as a matter of law because its interpretation is unreasonable  or, alternatively, because the exclusion is ambiguous and subject to more than one reasonable interpretation.  Additionally, the court finds that material factual disputes preclude the entry of summary judgment as to the exclusion.  The parties agree that the *Madrid* Action falls within the applicable exclusionary time period and named Scrushy and Capstone as defendants.  However, neither Scrushy nor Capstone was ever served with a copy of the *qui tam* complaint or appeared in the case.

The pertinent language of the exclusion calls for a determination of whether the *Madrid* Action was pending or existed "against" Scrushy or Capstone prior to the applicable Prior Litigation Date.  The court concludes that Twin City has failed to

established as a matter of Alabama law that an unserved but named defendant, such as Scrushy or Capstone, has an action pending "against" him or it with the meaning of the "prior litigation" exclusion.

Rule 4 of the Alabama Rules of Civil Procedure sets forth the general and miscellaneous provisions regarding service of process.  Rule 4(a)(4) defines the terms of "plaintiff" and "defendant."  "For the purpose of issuance and service of summons or other process, 'plaintiff' shall include any party seeking the issuance of service of summons, and 'defendant' shall include any party upon who service of summons or other process is sought."  Ala. R. Civ. P. 4(a)(4).  Concerning the *Madrid* Action, there is no evidence that the plaintiffs ever sought service of a summons or other process against Scrushy or Capstone; therefore, neither became an active party defendant in the pending *Madrid* Action.

Similarly, under Rule 12 of the Alabama Rules of Civil Procedure, neither Scrushy nor Capstone was required to respond to the *qui tam* complaint because neither had ever received "service of the summons and complaint"  and, as such, the claims set forth in the *Madrid* Action were never formally begun or pending against either one of them.  Ala. R. Civ. P. 12.  Moreover,  in the absence of service, neither Scrushy nor Capstone was subject to the court's jurisdiction in the *Madrid* Action.

Interpreting the term "against" to include a requirement of complete service

(1) in the absence of a specific definition within the Policy that excludes any requirement of service to trigger the application of the exclusion, and (2) in the presence of the Policy's definition of "Claim," which includes service as a necessary component, is reasonable.  Moreover, the interpretation is consistent with general case authority which addresses the status of named but non-served defendants as nonparties.  *See Saucier v. Katz*, 533 U.S. 194, 212 n. 1, 121 S. Ct. 2151, 1261 n. 1 (2001) ("Though named as a defendant, Parker was never served with the complaint, and therefore did not become a party to this litigation."); *Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 350 (1999) ("[O]ne becomes a party officially . . . only upon service of a summons or other authority-asserting measure stating the time within which the party served must appear and defend."); *Loman Dev. Co. v. Daytona Hotel & Motel Suppliers, Inc.*, 817 F.2d 1533, 1536 (11th Cir. 1987) (holding that non-served defendants "were not yet 'parties'" under Federal Rule of Civil Procedure 54(b)); *Thompson v. Scott*, No. 03-40408, 86 Fed. Appx. 17, 18, 2004 WL 57718, at *1 (5th Cir. Jan. 9, 2004) (". . . Schroedter was never served with process nor filed an appearance and hence was not a party to the case."); *Pennsylvania National Mutual Cas. Ins. Co. v. KYM Industries*, No. 1:05cv951-CSC, 2006 WL 2414052, *1 n.1 (M.D. Ala. Aug. 21, 2006) ("The other defendant, G & S Custom Covers, Inc. ('G & S'), was never properly served, and thus, is not a party to

27

this action.") (internal citation omitted); *see also* Black's Law Dictionary (6th ed. 1990) at 1119 (defining parties as "persons who take part in the performance of any act, or who are directly interested in any affair, contract, or conveyance, or who are actively concerned in the prosecution and defense of any legal proceeding") (citing *Green v. Bogue*, 158 U.S. 478, 503 (1895) ("'Parties, in the larger legal sense, are all persons having a right to control the proceedings to make defense, to adduce and cross-examine witnesses, and to appeal from the decision, if an appeal lies.'")). Therefore, Twin City is unable to show that the "prior litigation" exclusion applies as a matter of law.

### d.   The "Fraud" Exclusion

Twin City has also failed to show that the Policy's "fraud" exclusion applies as a matter of law either because its interpretation of the provision is unreasonable or, alternatively, because the language of the exclusion is ambiguous and is subject to more than one reasonable interpretation.  Additionally, the court finds that material factual disputes preclude the entry of summary judgment as to the exclusion. Accordingly, Twin City has not carried its burden of showing the application of the "fraud" exclusion as a matter of law.

Twin City bases its "fraud" exclusion argument upon Martin's guilty plea in which he factually admitted that he fraudulently reported the earnings for

28

HealthSouth to meet projections and "did not fairly present the financial condition and operating results of HealthSouth."  Martin's guilty plea is a judgment admitting to fraudulent acts pertaining to HealthSouth's reported earnings and makes no mention of Capstone.  Under the "fraud exclusion," the critical question becomes whether the "Claim" against Capstone as set forth in the *Tucker* Derivative Action is "based upon, arising from, or in any way related to" Martin's criminal judgment for misrepresenting the reported earnings of HealthSouth.

As it pertains to Capstone, the corporate Insured under the Policy, the *Tucker* Derivative Action focuses upon allegations that HealthSouth sold properties to Capstone for below-market values and then leased them back at excessive prices.  As HR Acquisition points out, these particular allegations from the *Tucker* Derivative Action translate into an overstatement of HealthSouth's expenses, rather than an overstatement of its earnings as described in Martin's plea.

The "fraud" exclusion is ambiguous in the context of a director or officer's engaging in multiple fraudulent schemes or multiple fraudulent acts, resulting in various types of injuries to numerous parties, and having a judgment entered that addresses the scope of some of the person's fraudulent conduct, but not all of it. Moreover, Alabama case law does not support Twin City's broad reading of  the "arising" language in the context of an exclusion. *See Industrial Chem. & Fiberglass*

*v. Hartford Accident & Indem. Co.*, 475 So. 2d 472, 477 (Ala. 1985) (holding that, to enforce a "repair operation" exclusion with "arising" language, the insurer had to "prove that the repair operation was the cause of the bodily injury"); *American Liberty Ins. Co. v. Soules*, 288 Ala. 163, 167, 170, 258 So. 2d 872, 875, 878 (Ala. 1972) (equating "arising out of" with "proximate cause"). Therefore, material factual issues exist as to whether the type of fraud alleged in the *Tucker* Derivative Action relating to Capstone is causally connected to or distinct from the type of fraud to which Martin plead guilty relating to HealthSouth. Accordingly, the "fraud" exclusion does not apply as a matter of law.

### e.    "Loss" Under the Policy

Twin City's final argument on summary judgment is that HR Acquisition (*i.e.*, the renamed Capstone) is unable to demonstrate "Loss" under the Policy because it lacks proof that it is the party "legally liable to pay" the defense expenses incurred as a result of the *Tucker* Derivative Action. Twin City has similarly failed to show that HR Acquisition has not demonstrated "Loss" under the Policy as a matter of law either because its interpretation of the provision is unreasonable or, alternatively, because the language of "Loss" is ambiguous and is subject to more than one reasonable interpretation. Additionally, the court finds that material factual disputes preclude the entry of summary judgment as to Twin City's position as to "Loss" under

the Policy.

The majority of the documents on summary judgment show that, historically, HR Acquisition has not paid for any of the defense costs related to the *Tucker* Derivative Action.  Instead, HRT, the parent of HR Acquisition, and another entity, ASMI/Birmingham, have paid for HR Acquisition's past legal fees.

In opposition to summary judgment, HR Acquisition draws a distinction between contracts to indemnify against liability and contracts to indemnify against loss and points out that actual payment of legal fees is not necessary to trigger coverage under the Policy, both from a plain language standpoint and also pursuant to applicable case law because the Policy is a liability (as opposed to a loss or actual payment by the insured) contract.  *See Michel v. American Fire & Cas. Co.*, 82 F.2d 583, 586 (5th Cir. 1936) ("Again the provision, 'The indemnity provided hereunder shall apply only to such liability as may be imposed in civil actions,' fairly states that the indemnity is not against payment but against the imposition of liability by judgment in a civil action.")[8]; *Little v. MGIC Indem. Corp.*, 836 F.2d 789, 793 (3d Cir. 1987) ("Under a liability policy, by contrast, the insurer's obligation to pay arises as soon as the insured incurs liability for the loss; the insured need not pay the loss

---

[8]In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

first."); *see also In re Worldcom, Inc., Securities Litigation*, 354 F. Supp. 2d 455, 464 (S.D.N.Y. 2005) ("It is a general principle under insurance law, that the obligation to pay under a liability policy arises as soon as the insured incurs the liability for the loss, in contrast to an indemnity policy where the obligation is to reimburse the insured for a loss that the insured has already satisfied."); *cf. Pan Pacific Retail Properties, Inc. v. Gulf Insurance Co.*, 471 F.3d 961, 972 (9th Cir. 2006) ("[T]he definition of 'Loss' in the Twin City Policy . . . anticipate[d] that Insuring Agreement B(1) will not be treated as a liability policy, which would only require that the insureds incur a legal obligation to pay damages or other expenses for indemnification by the insurer."); *see also McCuen v. American Cas. Co.*, 946 F.2d 1401, 1407 (8th Cir. 1991) (holding that an obligation to advance defense costs "imposes a duty upon the insurer to pay the insureds' defense costs as they are incurred"); *National Union Fire Ins. Co. v. Brown*, 787 F. Supp. 1424, 1434 (S.D. Fla. 1991) (holding that payment of defense costs were "payable at the time the directors and officers incur[red] them, not at some future time").

Relatedly, HR Acquisition also argues that nothing in the Policy prohibits an Insured from obtaining payment from another source, such as a parent company, in the form of an advancement on fees.  Therefore, the court concludes that a lack of actual payment by HR Acquisition does not mean that it has suffered no "Loss" as

defined under the Policy.  *Cf. Centon Elecs., Inc. v. Bonar*, 614 So. 2d 999, 1004 (Ala. 1993) ("Although the collateral source rule is not applicable to a claim for breach of contract, Bonar is not precluded as a matter of law from recovering under his contract claim on the ground that he suffered no damage or loss.").  When the nonbreaching party remains obligated for some portion of the amount paid on its behalf, the contract claim remains viable.  *See id.*  ("[I]t is a basic tenet of contract law that damages for a breach of contract should not put the injured party in a better position than he would have been in if there had been performance; however, it is equally well settled that damages for a breach of contract should return the injured party to the position the party would have been in had the contract been fully performed.").

Finally, HR Acquisition relies upon the affidavit testimony of HRT's controller, Glenn Herndon, who states that HR Acquisition remains obligated to HRT on the advancement of any defenses costs, and further that the *Tucker* Derivative Action fees and expenses are now being paid by HR Acquisition directly, including a recent February 16, 2007, payment in the amount of $25,843.06, and all future billings.  (Doc. #28 at Ex. 4 ¶ 4; *id.* ¶ 7).  Therefore, and alternatively, even if Twin City is correct that actual payment of defense costs by HR Acquisition is necessary to effectuate coverage  under the Policy (which the court has decided it does not), the

evidence of a recent legal statement as well as all future invoices being paid directly by HR Acquisition is sufficient to create a material factual issue as to whether HR Acquisition has incurred a "Loss" under the Policy.  Accordingly, summary judgment in favor of Twin City on this basis is also due to be denied.

### B.      Duty to Indemnify

The focus of the parties' dispute at this stage is over the costs of defense as no judgment as to Capstone's liability in the *Tucker* Derivative Action has been determined.  Therefore, no arguable "Loss" with respect to indemnification under the Policy has occurred yet.

Twin City seeks summary judgment on its duty to indemnify under the Policy based upon the same arguments raised against its duty to defend.  For the same reasons stated above as to Twin City's Motion for Summary Judgment on the the duty to defend, its Motion also fails as to the duty to indemnify.

## V.      CONCLUSION

For all the reasons explained above, Twin City's Motion for Summary Judgment is due to be denied.  The court will enter an order consistent with this Memorandum Opinion.

**DONE** and **ORDERED** this the 9th day of April, 2007.

**VIRGINIA EMERSON HOPKINS**
United States District Judge